# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| JACQUELINE MITCHELL, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 3:12-01060** |
| v. | ) | **Judge Nixon/Brown** |
| | ) | |
| MICHAEL J. ASTRUE, COMMISSIONER | ) | |
| OF SOCIAL SECURITY, | ) | |
| | ) | |
| **Defendant.** | ) | |

**To: The Honorable John T. Nixon, Senior United States District Judge**

### REPORT AND RECOMMENDATION

This action was brought under 42 U.S.C. §§ 405(g) and 1383(c) for judicial review of the final decision of the Social Security Administration ("the SSA"), through its Commissioner ("the Commissioner"), denying plaintiff's applications for Disability Insurance Benefits (DIB) under Title II of the Social Security Act ("the Act"), 42 U.S.C. §§ 416(i), 423(d), and Supplemental Security Income (SSI) under Title XVI of the Act, 42 U.S.C. §§ 1381, *et seq*. For the reasons explained below, the undersigned **RECOMMENDS** that the plaintiff's motion for judgment on the record (DE 12) be **DENIED**, and the Commissioner's decision **AFFIRMED**.

### I. PROCEDURAL HISTORY

Plaintiff filed an application for DIB and SSI on December 20, 2008, claiming disability due to left knee replacement, right knee osteoarthritis, and depression, with a disability onset date of June 1, 2008. (Doc. 10, pp. 14, 16, 105, 536) Plaintiff's claims were denied initially on June 22, 2009, and upon reconsideration on October 7, 2009. (Doc. 10, pp. 27-45)

Plaintiff requested a hearing before an Administrative Law Judge (ALJ) on November 9, 2009. (Doc. 10, pp. 46-47) Plaintiff, represented by counsel, testified at a hearing before ALJ David

Ettinger on December 14, 2010. (Doc. 10, pp. 533–53) Vocational expert (VE) Kenneth Anchor testified at the hearing. (Doc. 10, pp. 549-52)

The ALJ entered an unfavorable decision on January 4, 2011. (Doc. 10, pp. 11-22) On January 4, 2011, plaintiff requested that the Appeals Counsel review the ALJ's decision. (Doc. 10, p. 10) The Appeals Counsel denied the request on August 15, 2012 (Doc. 10, pp. 6-9), whereupon the ALJ's decision became the final decision of the Commissioner.

Plaintiff brought this action on October 15, 2012 seeking judicial review of the Commissioner's decision. (Doc. 1) Plaintiff filed a motion for judgment on the administrative record on January 22, 2013 (Doc. 12), to which the Commissioner responded in opposition on February 21, 2013 (Doc. 13), and plaintiff replied on March 13, 2013 (Doc. 14). This matter is now properly before the court.

## II. REVIEW OF THE RECORD

### A. Medical Evidence

As noted on p. 1 above, plaintiff's disability claims stem from left knee replacement, right knee osteoarthritis, and depression. As shown below at pp. 15-21, the claims before the court pertain to the weight given by the ALJ to evidence provided by plaintiff's therapist at Centerstone, Angelia Amonett, MA, and the ALJ's credibility determination. The medical evidence below has been tailored to those two claims.

Plaintiff underwent a consultative physical examination on December 2, 2007 by Dr. Bruce Davis, M.D. (Doc. 10, pp. 161-163) Dr. Davis determined that plaintiff could lift 10 to 20 pounds 1/3 of the time during an 8-hour workday, 10 pounds 2/3 of the time during an 8-hour workday, that she could stand 4 hours (one hour uninterrupted) during an 8-hour workday with limited squatting and kneeling, and that she could sit for 8 hours during an 8-hour workday. (Doc. 10, p. 163)

2

Dr. Glenn James, M.D., completed a physical functional capacity assessment of plaintiff on December 21, 2007. (Doc. 10, pp. 164-171) Dr. James determined that plaintiff could lift 20 pounds occasionally, 10 pounds frequently, that she could stand and/or walk at least 2 hours in an 8-hour workday, that she could sit for about 6 hours during an 8-hour work day, and that she had no pushing and/or pulling limitations. (Doc. 10, p. 165) Dr. James further determined that plaintiff could climb, balance, stoop, kneel, crouch, and or crawl occasionally. (Doc. 10, p. 166)

Robert Doran, M.A., conducted a consultative psychological evaluation of plaintiff on January 21, 2008. (Doc. 10, pp. 172-75) Mr. Doran reported that plaintiff was "an unreliable historian . . . vague and evasive." (Doc. 10, pp. 172, 174) Mr. Doran noted that plaintiff first represented that she had never been diagnosed with a mental health disorder before, but stated later that she had been diagnosed with depression following the 2002 death of her son in an automobile accident. (Doc. 10, p. 172) During the examination, plaintiff reported numerous symptoms, including forgetfulness, nervousness, irritability, mood swings, and depression. (Doc. 10, p. 173) Mr. Doran stated that plaintiff "did not adequately describe symptoms consistent with a diagnosis of 'depression,'" therefore he declined to make that diagnosis. (Doc. 10, p. 174) Mr. Doran found plaintiff had mild limitations in her ability to understand and remember, interact with others, and adapt to change. (Doc. 10, p. 175) He stated that she had moderate limitations in her ability to sustain concentration and persistence. (Doc. 10, p. 175)

On February 6, 2008, Dr. William Meneese, Ph.D., conducted a mental residual functional capacity assessment of plaintiff. (Doc. 10, pp. 176-93) Dr. Meneese determined that plaintiff's understanding and memory, sustained concentration and persistence, social interaction, and adaptation were not significantly limited for the most part, with only instances of moderate limitations. (Doc. 10, pp. 176-79) More particularly, Dr. Meneese determined that plaintiff: 1)

3

could understand, remember, and carry out short and simple instructions/tasks, but not detailed or complex ones; 2) could maintain sufficient attention to complete simple tasks without the need for special supervision or more than usual and customary rest breaks; 3) could tolerate non-intense interaction with co-workers, supervisors, and the public; 4) required tactful and supportive supervision; 5) required gradual interaction with changes in the workplace; 5) could set simple, short-term, realistic work goals, but required assistance with those that were long-term and complex. (Doc. 10, p. 178) Dr. Meneese noted that plaintiff's allegations were not fully credible given the consistency between Mr. Doran's report and plaintiff's daily living activities. (Doc. 10, p. 192) Finally, Dr. Meneese assigned plaintiff a Global Assessment of Functioning (GAF) score of 65.[1] (Doc. 10, p. 192)

An MRI of plaintiff's left knee dated September 17, 2008 revealed several problems with her left knee. (Doc. 10, pp. 199-200) Thereafter, plaintiff underwent a total knee replacement of her left knee at the Nashville General Hospital ("Nashville General") on January 6, 2009. (Doc. 10, pp. 197-230)

Alice Garland, M.S., conducted a consultative psychological evaluation of plaintiff on June 5, 2009. (Doc. 10, pp. 231-33, 236) Ms. Garland's impression included diagnosis of a depressive disorder, but not one that fit any specified diagnoses, discounted panic disorder without agoraphobic features, and ruled out personality disorder with dependent features. (Doc. 10, p. 233) Ms. Garland made the following further observations: 1) plaintiff "did not appear to be a woman who would have limitation in ability to do complex and detailed work"; her ability to persist and concentrate "may

---

[1] A GAF score of 65 pertains to "some mild symptoms . . . OR some difficulty in social, occupational, or school functioning. . . but generally functioning pretty well, has some meaningful interpersonal relationships. *The Diagnostic and Statistical Manual, Fourth Edition, Text Revision (DSM-IV-TR)* (2000, p. 34)(bold omitted). *DSM-IV-TR* was the edition in effect at all times relevant to this action.

4

be moderately limited"; her "[a]bility to work with the public does not appear limited"; her "[a]daptation does not appear to be over mildly limited." (Doc. 10, p. 236)

Plaintiff went to the emergency room on June 11, 2009 complaining of pain in her right knee. (Doc. 10, pp. 315-20) The record describes plaintiff "[i]n no acute distress," with "[n]ormal ambulation," and only "mild" knee pain. (Doc. 10, p. 316)

Dr. Bruce Davis, M.D., of Corporate Services, Inc. conducted a consultative physical examination of plaintiff on June 14, 2009. (Doc. 10, p. 234) Dr. Davis noted that plaintiff was in "[n]o acute distress," that her left knee exhibited post-surgical "pain, tenderness, warmth, crepitus/clicking, incomplete flexion 100o [*sic*], show extension 0o [*sic*], incomplete squatting." (Doc. 10, p. 234) Dr. Davis noted the following with respect to plaintiff's right knee: "full motion, mild crepitus, no swelling/warmth . . . [m]ild gait limp with slow gait maneuvers (heel, toe, & tandem) across exam room without assistance. No atrophy, normal reflexes." (Doc. 10, p. 234)

Dr. Jeffrey Wright conducted a mental residual functional capacity examination of plaintiff on June 16, 2009. (Doc. 10, pp. 237-254) Dr. Wright noted that plaintiff's understanding and memory were not significantly limited, that she had some mild limitations in sustained concentration and persistence, but no significant limitations in either social interactions or adaptation. (Doc. 10, pp. 237-38) Dr. Wright noted particularly that plaintiff: 1) can understand and remember simple and detailed, non-complex tasks; 2) has some but not substantial difficulty maintaining concentration and persistence; 3) can interact appropriately with the public, supervisors and co-workers, and can set goals independently, adapt and respond to changes. (Doc. 10, p. 239) Dr. Wright wrote that plaintiff's subjective allegations were only partially credible because they were inconsistent with objective findings in the record, and that plaintiff's limitations in any given area were "no more than moderate." (Doc. 10, p. 253)

Dr. Joe Allison, M.D., conducted a physical residual functional capacity assessment on June 22, 2009. (Doc. 10, pp. 255-63) Dr. Allison determined that plaintiff could lift 20 pounds occasionally, 10 pounds frequently, that she could stand and/or walk at least 6 hours during an 8-hour workday, that she could sit for about 6 hours during an 8-hour work day, that she could push and/or pull only occasionally due to limitations of the left lower extremities. (Doc. 10, p. 256) Dr. Allison further determined that plaintiff could climb, stoop, kneel, crouch, and/or crawl occasionally, but that she could "never" balance, and that she should avoid concentrated exposure to extreme could and workplace hazards such as machinery and heights. (Doc. 10, pp. 257, 259) He also noted that plaintiff's "symptoms of knee pain [were] expected to resolve with her left knee replacement . . . ," and that her "right knee pain should respond to appropriate medical treatment." (Doc. 10, p. 260)

Plaintiff presented at Centerstone for treatment on July 6, 2009 for depression that she attributed to her son's death in 2002. (Doc. 10, pp. 398-412, 432, 513-21, 525-29) Plaintiff also reported "fleeting" hallucinations, being in a daze, wanting to isolate herself, and unresolved anger. (Doc. 10, p. 528) A preliminary Clinically Related Group (CRG) assessment was completed at initial intake with "marked" limitations recorded in activities of daily living, interpersonal functioning, concentration, task performance, pace, and adaption to change. (Doc. 10, pp. 398-400, 522-24) The preliminary CRG placed plaintiff in Consumer Group 1 – a person with severe persistent mental illness – with a Global Assessment of Functioning (GAF) score of 48. (Doc. 10, p. 400) A psychiatric evaluation completed at Centerstone that same day by Dr. John Pate, M.D., and Elizabeth Swope, MSN, established that plaintiff actually had a current GAF score of 54. (Doc. 10, pp. 409-12)

As previously noted above at p. 2, Ms. Amonett was assigned as plaintiff's therapist at

6

Centerstone. (Doc. 10, p. 529) The Centerstone records show that plaintiff presented for treatment with Ms. Amonett on the following days: July 14, 2009 (Doc. 10, pp. 430-31); July 21, 2009 (Doc. 10, pp. 427-28); August 4, 2009 (Doc. 10, pp. 424-25); August 25, 2009 (Doc. 10, pp. 420-21); September 1, 2009 (Doc. 10, pp. 413-14); September 15, 2009 (Doc. 10, p. 493); January 29, 2010 (Doc. 10, p. 483); July 16, 2010 (Doc. 10, p. 483); October 6, 2010 (Doc. 10, pp. 453-56).[2] The record shows that Ms. Amonett completed a mental status exam during plaintiff's August 4, 2009 visit, the factors pertaining to which were rated variously as "[a]ppropriate," "organized," "[n]ormal," "[w]ithin normal limits," or "[g]ood." (Doc. 10, p. 424) Plaintiff participated in group therapy or one-on-one therapy with Ms. Amonett on the other dates noted above.

Plaintiff saw Dr. Robert Johnston, M.D., at Nashville General on July 20, 2009 for follow-up on her left knee. (Doc. 10, p. 445) Dr. Johnston found that her left knee had "excellent motion and good stability" and stated that she was "generally doing well in regard to her left knee." (Doc. 10, p. 445) During this appointment, plaintiff also complained of right knee pain. (Doc. 10, p. 445) Noting that previous x-rays revealed no osteoarthritis, Dr. Johnston recommended an MRI and another appointment in two weeks. (Doc. 10, p. 445)

Plaintiff saw Dr. Johnston on July 28, 2009 concerning her right knee. (Doc. 10, p. 277) Comparing an MRI made that date with one made on September 17, 2008, Dr. Johnston noted that, apart from "nonspecific" degenerative changes, and "probable torn medial meniscus," any issues were "moderate," "mild," and "small" in nature, with the structure of the knee generally unremarkable. Plaintiff reported during this same approximate time frame, *i.e.*, on June 17, July 20, and August 11, 2009 that, although painful, she had no functional limitations due to her knees, *i.e.*,

_____

[2] The record shows that plaintiff was a "no show" on more than a dozen occasions (Doc. 10, pp. 422, 423, 426, 452, 463, 472, 483, 485-88, 490-91, 498), and that she twice failed to participate in therapy for a period of six months, from September 2009 to January 2010, and again from January 2010 to July 2010.

7

"walking or getting up from bed/chairs." (Doc. 10, pp. 267, 276, 279)

Plaintiff next saw Dr. Johnston on May 27, 2010. (Doc. 10, p. 441) Plaintiff stated that her left knee replacement was doing well, but she continued to complain of right knee pain and requested a right knee replacement. (Doc. 10, p. 441) Although Dr. Johnston initially appeared to agree to plaintiff's request, Dr. Johnston later determined that Plaintiff "does not really have enough findings to warrant a knee replacement at this time." (Doc. 10, p. 440) He recommended a follow-up appointment in six months instead. (Doc. 10, p. 440)

A second CRG completed at Centerstone on July 16, 2010 remained essentially unchanged from the one completed on July 6, 2009 in the sense that plaintiff remained classified as Consumer Group 1. (Doc. 10, p. 470) However, that CRG reflected a current GAF score of 54, as did all of the Centerstone records from the psychiatric evaluation on July 6, 2009 through July 16, 2010. (Doc. 10, pp. 401, 411, 418, 449, 455, 465, 470, 482, 499)

On October 10, 2010, Ms. Amonett completed a medical source statement (mental) in which she noted the following with respect to plaintiff: 1) marked limitations in understanding and remembering simple instructions; 2) marked limitations in the ability to carry out simple instructions; 3) marked limitations in the ability to make judgments on simple work-related decisions; 4) extreme limitations in the ability to understand and remember complex instructions; 5) extreme limitations in ability to carry out complex instructions; 6) extreme limitations in the ability to make judgments on complex work-related decisions; 7) extreme limitations in the ability to interact appropriately with the public; 8) extreme limitations in the ability to interact appropriately with supervisors; 9) extreme limitations in the ability to interact appropriately with co-workers; 10) extreme disability in the ability to respond appropriately to usual work situations and to changes in routine work setting. (Doc. 10, pp. 436-37)

8

## B. Transcript of the Hearing

Questioned first by her attorney, plaintiff testified that she was 48-years of age at the time of the hearing, that she graduated from high school, but had no college, and that she could read, write, add and subtract. (Doc. 10, p. 537) Plaintiff also testified that her driver's license had been suspended for failure to pay a ticket, that she smoked approximately one-half pack of cigarettes a day, that she "[s]ometimes" drank alcohol, that she had used crack cocaine for five to six years, but that she had been "clean" for two years. (Doc. 10, pp. 538-39) Plaintiff testified that she was not working at the time of the hearing, but that she had worked as a cook for eleven years. (Doc. 10, p. 539) She testified that, although she had not had the authority to hire or fire employees in that job, or to order food products, she did train other employees. (Doc. 10, p. 540)

In response to physical health-related questions, plaintiff testified that she had problems with both of her knees, that she had five to six surgeries on her left knee ending up in a total knee replacement, and that she was scheduled to have her right knee replaced the following March due to "severe arthritis." (Doc. 10, p. 540) According to plaintiff, her first knee surgery was in 1998 due to torn ligaments and cartilage, and that the remaining surgeries were necessary to treat an infection. Plaintiff testified that she quit her job as a cook because of her knees, and that she could not return to work as a cook because of her knees. (Doc. 10, pp. 541, 544)

As for alleged emotional issues, plaintiff testified that she had been receiving treatments at Centerstone for "[t]wo years," that she had been diagnosed with "[s]ome kind of paranoia" that caused her to see things every day, but the voices never told her to do anything, and to hear voices "every now and then." (Doc. 10, pp. 541, 544) When she went to Centerstone, plaintiff saw a therapist and a nurse. (Doc. 10, pp. 541, 544) Plaintiff identified the therapist as "Angie," but did not know her last name. (Doc. 10, pp. 541-42) Plaintiff testified that she had been seeing Angie

9

about once a week for the last two years. (Doc. 10, p. 543)

Plaintiff testified further that she suffered from depression that began in 2002 when her son died, and that her depression made it "hard for [her] to . . . get along with people." (Doc. 10, p. 542) She repeated that she was paranoid, noting that she could not "stand to be closed up." (Doc. 10, p. 542) Plaintiff also testified that she had panic attacks – fewer when her medication (Cymbalta) was "really working" – that caused her to have breathing difficulties and to become paranoid, the solution for which was to calm herself by being alone. (Doc. 10, p. 542) Finally, plaintiff testified that she had problems concentrating, that when she read something she would "have to go back and read it again,' and when she watched television, she did not understand what was being said. (Doc. 10, p. 543)

Plaintiff testified that she could lift "about 10 pounds" on a one-time basis, 2 to 3 pounds on a frequent basis, that she could stand for 1 to 2 hours at a time, and that she could stand "two to three hours" in an 8-hour day. (Doc. 10, p. 545) When asked how long she could sit, plaintiff testified that she could only sit about 15 minutes because sitting "cut[] off [the] circulation" to her legs. (Doc. 10, p. 545) When asked how long she could sit in an 8-hour day, plaintiff testified that she could sit a maximum (total) of 15 minutes all day, and that she had to "sit down, get up, sit down, get up, that's . . . the only way I can do it." (Doc. 10, p. 545) Plaintiff testified further that, when her knees hurt, she had to "sit down or lay down." (Doc. 10, p. 546) Plaintiff testified that she could walk "about . . . half a football field." (Doc. P. 546)

On examination by the ALJ, plaintiff testified that her daughter had been caring for her financial needs since she quit her job, that apart from food stamps she had no income of her own, and that she had not received unemployment benefits or a pension when she quit her job as a cook. (Doc. 10, p. 546) When the ALJ asked if she had applied for a job since 2007, plaintiff testified that

10

she had gone to work at Vanderbilt "for about . . . two days because [she] . . . couldn't handle the work." (Doc. 10, p. 546)

The ALJ then asked plaintiff to clarify her earlier testimony that she had been treated at Centerstone for two years, noting that he had not received the records until the prior Friday and that he had not had a chance to "look carefully at them."[3] (Doc. 10, p. 547) When the ALJ pointed out that the record "indicate[d] that they first saw you in July 2009," and that was not "quite two years," plaintiff replied "I thought it was two years," adding that she was "still going to . . . [Angie]." (Doc. 10, p. 547) In response to plaintiff's testimony that she had seen Angie about once a week for the last two years, the ALJ noted that the records showed that plaintiff had been "absent from treatment" for six months in the first part of 2010. (Doc. 10, pp. 547-48) When asked to explain, plaintiff replied that the pain in her knees kept from going for treatment. (Doc. 10, p. 548) When the ALJ asked plaintiff if she was correcting her earlier testimony that she saw her therapist three or four times a month, *i.e.*, once a week, she replied "I think so, yes, sir." (Doc. 10, pp. 548-49) Plaintiff then amended her earlier testimony to reflect that she saw Angie about "two or three times a month . . . ." (Doc. 10, p. 549)

The ALJ turned his questioning to the VE with the following hypothetical:

> If I were to consider a hypothetical worker who was 48 years old, had a 12th grade education, the same past relevant work as Ms. Mitchell, who was capable of sedentary work, except that they were not able to carry out complex or detailed instructions, not able to maintain attention or concentration for more than two hours without having a short break and not able to have more than occasional interaction with others, would a worker with those characteristics and limitations be able to perform the claimant's past work?

---

[3] The hearing was held the following Tuesday.

(Doc. 10, p. 550)  The VE answered, "[S]he would not."  (Doc. 10, p. 550)  When the ALJ asked if there were other work the hypothetical worker could do, the VE answered that there were several jobs at the sedentary level, *i.e.*, production clerk, table worker, and machine tender, all of which were available in substantial numbers at the local level.  (Doc. 10, p. 550-51)

When asked what effect having to stand "briefly every two hours" would have, the VE testified, "There would be no impact . . . ."  (Doc. 10, p. 551)  When asked what effect having to stand "briefly once every hour" would have, the VE testified, "I don't believe it would impact on these jobs . . . ."  (Doc. 10, p. 551)  When asked what effect of the hypothetical worker "could not respond appropriately to even a minimum level with supervisors and co-workers" would have, the VE testified that it would be a "seriously unfavorable factor" that would "interfere with the individual to function in the workplace."  (Doc. 10, p. 551)  The VE further testified that, if it were a "persistent, chronic condition . . . not being managed, or moderated in any way . . . it would rule out these jobs."  (Doc. 10, p. 551)  Finally, the ALJ asked the VE what the effect would be if "the hypothetical worker could not, on a sustained basis, understand, remember and carry out even simple instructions," to which the VE replied, "it would result in termination."  (Doc. 10, p. 551)

Plaintiff's attorney then posed the following hypothetical to the VE:

> Dr. Anchor, I want you to assume the same individual that was described by the judge; the same work history as cook, medium and skilled; 12th grade education, and assume this individual's ability to lift would be no more than 10 pounds maximum on one occasion; on a regular basis, she'd be able to lift two to three pounds.  Her ability to stand would be no more than 30 minutes, no more than one hour at a time, two to three hours maximum during the workday.  Sitting would be approximately 15 minutes at one time, about two to three hours in a workday, and her ability to walk would be approximately 50 yards.  Would that eliminate the three positions that you had named?

(Doc. 10, p. 552)  The VE answered, "I believe it would, yes," to the hypothetical above.  When

12

asked what the effect would be if the hypothetical worker could stand and sit a maximum of 6 hours during a normal 8-hour workday, the VA answered that would eliminate all full-time jobs.

## III. ANALYSIS

### A. Administrative Proceedings Below

Under the Act, a claimant is entitled to disability benefits if she can show her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. §§ 404.1505, 416.905. Corresponding regulations outline the five-step sequential process described below to determine whether an individual is "disabled" within the meaning of the Act.

> First, the claimant must demonstrate that she has not engaged in substantial gainful activity during the period of disability.
>
> Second, the claimant must show that she suffers from a severe medically determinable physical or mental impairment.
>
> Third, if the claimant shows that her impairment meets or medically equals one of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P., App. 1, then she is deemed disabled.
>
> Fourth, the ALJ determines whether, based on the claimant's RFC, the claimant can perform her past relevant work, in which case the claimant is not disabled.
>
> Fifth, the ALJ determines whether, based on the claimant's RFC, as well as her age, education, and work experience, the claimant can make an adjustment to other work, in which case the claimant is not disabled.

*See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Wilson v. Commissioner of Social Sec*., 378 F.3d 541, 548 (6th Cir. 2004)(internal citations omitted); *Cruse v. Comm'r of Soc. Sec*., 502 F.3d 532, 539 (6th Cir. 2007). The claimant bears the burden of proof at steps one through four. *Warner v. Comm'r*

*of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004). The burden then shifts to the Commissioner at step five "to identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity (determined at step four) and vocational profile." *Jones v. Comm'r Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003).

The SSA's burden at the fifth step may be met by relying on the medical-vocational guidelines, known in the practice as "the grids," but only if the claimant is not significantly limited by nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics in the applicable grid rule. *See Wright v. Massanari*, 321 F.3d 611, 615-16 (6th Cir. 2003). In cases where the grids do not direct a conclusion as to the claimant's capacity, the SSA must rebut the claimant's *prima facie* case by coming forward with proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through the testimony of a VE. *See Wright*, 321 F.3d at 616 (quoting Soc. Sec. Rul. 83-12, 1983 WL 31253, *4 (S.S.A.)). In determining the RFC for purpose of the analysis at steps four and five, the SSA is required to consider the combined effect of all the claimant's impairments. 42 U.S.C. §§ 423(d)(2)(B), (5)(B); *see Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir. 1988).

A review of the record shows that the ALJ complied with the required five-step process. Nor does plaintiff allege that he did not.

### B. Standard of Review

The district court's review of the Commissioner's final decision is limited to determining whether the findings of fact are supported by substantial evidence in the record, and whether the correct legal standards were applied. 42 U.S.C. § 405(g); *Elam ex rel. Golay v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003); *Key v. Callahan* 109 F.3d 270, 273 (6th Cir. 1997). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such

14

relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)(quoting *Cutlip v. Sec'y of Health & Human Servs.*, 10 F.3d 284, 286 (6th Cir. 1994)). The Commissioner's decision must stand if substantial evidence supports the conclusion reached, even if the evidence also could support a different conclusion. *His v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). In other words, if the ALJ's findings are supported by substantial evidence based on the record as a whole, then those findings are conclusive. 42 U.S.C. §§ 405(g), 1383(c); *Key*, 109 F.3d at 273.

### C. Claims of Error

#### 1. The ALJ Erred by Significantly Misrepresenting the Evidence and Not Giving Proper Weight to the Opinion of the Plaintiff's Treating Mental Health Provider

Plaintiff argues first that the ALJ did not provide "the required 'good reasons' for discounting the treating source opinion" of Ms. Amonett in violation of SSR 06-3p. (Doc. 12, pp. 7-11) More particularly, plaintiff argues that the ALJ discounted Ms. Amonett's "opinion merely 'because of her limited qualifications, but more importantly because she ha[d] a very limited sporadic treatment relationship with claimant,'" and "he failed to mention or apply SSR 06-3p." (Doc. 12, pp. 7, 10) As to the nature and duration of the relationship, plaintiff argues that "the ALJ erroneously noted that Ms. Amonett 'has a very limited sporadic treatment relationship with claimant,'" having seen plaintiff "'just twice (January 29, 2010 and July 16, 2010) before completing the assessment . . . on October 6, 2010." (Doc. 12, p. 10) Plaintiff argues that plaintiff had seen Ms. Amonett at least ten times prior to completing the assessment. (Doc. 12, p. 10)

Acceptable medical sources who/that can provide evidence to establish an impairment under the facts of this case generally are "licensed physicians (medical or osteopathic doctors)" and "[l]icensed or certified psychologist." 20 C.F.R. §§ 404.1513(a)(2) and 416.913(a)(2). However,

15

other sources who/that may provide evidence under the facts of this case to show the severity of an impairment and how it affects the ability to work would include plaintiff's therapist, Ms. Amonett. 20 C.F.R. §§ 404.1513(d)(1) and 416.913(d)(1).

The factors to be considered in evaluating evidence provided by plaintiff's therapist include: 1) the examining relationship; 2) the treatment relationship; 3) the length of the relationship; 4) the nature and extent of the treatment relationship; 5) the supportabilty of the opinion; 6) the consistency of the opinion with the record as a whole; 7) specialization; 8) other factors. *Gayheart v. Commissioner of Social Security*, 710 F.3d 365, (6th Cir. 2013)(citing 20 C.F.R. § 404.1527 & SSR 06-03p). Harmless error may be found, however, where the Commissioner has met the goal of § 404.1527(d) even though he has not complied with the terms of the regulation. *See e.g., Cole v. Astrue*, 661 F.3d 931, 940 (6th Cir. 2011).

The following excerpts from the ALJ's written decision are relevant to this issue:

> The undersigned has . . . considered opinion evidence in accordance with the requirements of 20 C.F.R. § 404.1527 and 416.927 and SSRs 96-2p, 96-5p, 96-6p and 06-3p. (Doc. 10, p. 18)

> There is no evidence that claimant received mental health treatment until July 6, 2009, when she had her initial psychiatric evaluation at Centerstone. She reported being anxious since her January 2009 knee replacement and upset because her physician would no longer prescribe narcotic medication for her pain. She was diagnosed with a depressive disorder and assigned a Global Assessment of Functioning (GAF) score of 54. Claimant was prescribed Remeron and asked to return in four weeks. Claimant attended several group therapy sessions, but did not return to her medical provider until September of that same year, 2009. She reported that she had taken Remeron for a month without benefit. Claimant did not return to her medical provider until January 29, 2010, when she reported that she had been off her medications for many months and returned due to worsening depression and nerves. Claimant was again absent from treatment until she returned six months later on July 16, 2010. She reported that she was sleeping only four to five hours a night, but not sleepy during the day. She was again rated at 54 on the GAF

16

scale. Claimant next and most recently saw her medical provider and her therapist on October 6, 2010. She reported a recent anxiety attack, isolation, sleep disturbance, and audio hallucinations. She was frequently caring for a newborn grandson. She asked her therapist for help with a disability form. The completed form indicates that claimant has had marked functional limitations. The therapist also indicated on CRG forms that claimant has had marked functional limitations. However, she was again rated at 54 on the GAF scale. *The Diagnostic and Statistical Manual, Fourth Edition, Text Revision (DSM-IV-TR)* (2000, p. 34) explains that GAF ratings at 50 or below are indicative of serious symptoms of mental impairment, and that scores of 51 and above would be indicative of only moderate symptoms and difficulties. . . . (Doc. 10, pp. 18-19)

As noted above, claimant's therapist has indicated that she has marked and extreme mental limitations. In contrast, claimant's mental health medical provider has consistently rated her at 54 on the GAF scale, suggesting only moderate mental limitations. The consulting psychologist, Robert Doran, found only mild to moderate mental limitations as did two state mental health consultants. Mr. Doran also opined that claimant did not describe *symptoms sufficient for a diagnosis of depression.* The claimant's therapist identifies herself as having a MA in psychological counseling, but no license. I discount her opinion because of her limited qualifications, but more importantly because she has a very limited sporadic treatment relationship with claimant. She had seen claimant just twice (January 29, 2010 and July 16, 2010) before completing the assessment from on October 6, 2010. I give greatest weight to the consistent GAF ratings and find that claimant has the moderate mental limitations indicated above. (Doc. 10, pp. 20-21)

A review of the ALJ's decision reveals that he correctly identified the standard of review for medical evidence before him and credibility determinations as to that evidence. That review reveals further that the ALJ considered the factors set forth therein. However, it is apparent from the record that the ALJ did, in fact, err with respect to the number of times Ms. Amonett provided therapy to plaintiff. The ALJ wrote that Amonett saw plaintiff only twice, whereas, as noted on pp. 6-7 above, Ms. Amonett saw plaintiff at least nine times during the period in question. The question is whether the ALJ's decision to rely on GAF scores rather than Ms. Amonett's medical source statement is

17

harmless under *Jones*, or warrants remand for reconsideration in light of this error.

As discussed above at p. 8, Ms. Amonett's medical source statement characterized plaintiff as having marked-to-extreme mental/psychological limitations. The record shows, however, that of the nine times that Ms. Amonett saw plaintiff, enumerated above at pp. 6-7, Ms. Amonett only once conducted a mental status exam, the results of which were wholly unremarkable. On the other eight occasions, Ms. Amonett did not conduct mental status examination, but based her clinical observations solely on plaintiff's participation group or one-on-one therapy sessions. In other words, there is nothing in the record pertaining to Ms. Amonett's interaction with plaintiff that supports the findings in Ms. Amonett's medical source statement that plaintiff had marked to extreme mental/psychological limitations.

On the other hand, as discussed above at pp. 6-8, apart from a preliminary GAF score of 48 assigned at intake, Centerstone records consistently show that plaintiff had a current GAF score of 54 throughout the period of her treatment at Centerstone. A GAF score of 51 to 60 in *DSM-IV-TR* reads as follows: "Moderate symptoms . . . OR moderate difficulty in social, occupational, or school functioning . . . ."" *DSM-IV-TR*, p. 34 (bold omitted).[4] Moderate symptoms/limitations are not disabling under the Act.

The ALJ's decision to give controlling weight to plaintiff's GAF score is amply supported by the record before the Court. As noted above at p. 3, Mr. Doran, who characterized plaintiff as "an unreliable historian . . . vague and evasive," characterized her mental/psychological limitations in 2008 as mild to moderate. As noted above at pp. 3-4, Dr. Meneese characterized plaintiff's mental/psychological limitations later that same year as moderate at worst, and that plaintiff's claims

---

[4] *DSM-IV* was revised on May 27, 2013. The GAF score descriptions in *DSM-5* are identical to those in *DSM-IV-TR*.

18

were not fully credible.  As discussed above at. pp. 4-5, Ms. Garland characterized plaintiff's mental/psychological limitations in 2009 as mild to moderate.  Later in 2009, noting that plaintiff's subjective allegations were only partially credible because they were inconsistent with the objective findings in the record, Dr. Wright characterized plaintiff's mental/psychological limitations as mild to moderate.

Substantial evidence exists in the record to support the conclusion that, although the ALJ erred in his assessment of the length of the relationship between plaintiff and Ms. Amonett, that error was harmless.  Accordingly, this claim is without merit.

### 2. The ALJ Did Not Properly Evaluate and Assess Plaintiff's Statements as Required by Social Security Ruling 96-7p

Plaintiff argues that, "in explaining his credibility finding, the ALJ failed to make clear the weight accorded to the Plaintiff's specific allegations and testimony." (Doc. 12, p. 12) Plaintiff also argues that the ALJ "significantly misrepresented the evidence of record as it relates to Plaintiff's development of worsening pain and symptoms in her right knee after she underwent total left knee replacement in January 2009." (Doc. 12, p. 13)  Plaintiff argues further that the ALJ erred in referring to a January 2008 examination in which Dr. Doran indicated that plaintiff walked, stood, and sat without apparent difficulty.  (Doc. 12, p. 14)  Finally, plaintiff argues that the ALJ erred in his "conclusory" statement that plaintiff's "demeanor contributed to [his] conclusion that she did not recognize the seriousness of her testimony and did not take care to avoid exaggeration." (Doc. 12, p. 14)

"[The] ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability." *Jones*, 336 F.3d at 475.  Moreover, the ALJ's credibility determination is accorded "great weight and deference . .

. since the ALJ has the opportunity . . . of observing a witness's demeanor while testifying." *Jones*, 336 F.3d at 475. Still, an ALJ's decision to discount a claimant's credibility "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and any subsequent reviews the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, 1996 WL 374186 (July 2, 1996).

The ALJ's analysis pertaining to plaintiff's credibility is quoted below in its entirety. The references in brackets below refer to those parts of the record that support his analysis.

> I give substantial weight to claimant's testimony in finding that she is limited to less than a full range of sedentary work, but I further find that claimant exaggerated the extent of her functional limitations. Claimant's testimony regarding the frequen[c]y of her treatment visits to Centerstone was highly inconsistent with the documented treatment history. [Doc. 10, pp. 547-49; Doc. 12, p. 10 n. 2][5] Although claimant has complained of pain to her medical providers, she has never indicated an inability to sit for more than 15 minutes or to lift more than three pounds.[6] Claimant's demeanor contributed to my conclusion that she did not recognize the seriousness of her testimony and did not take care to avoid exaggeration. [Doc. 10, pp. 547-49]
>
> Claimant gave conflicting reports to the various professionals who evaluated her. She told Robert Doran that *she did not go to any worship services.* She told Ms. Garland that *she tried to go every week.* [Doc. 10, pp. 173, 233] She also told both psychological evaluators that she *had no friends,* but she reported in her application that she *talks on the phone daily and likes to go fishing with her neighbor.* [Doc. 10, pp. 173, 233] She told Ms. Garland that she

---

⁵ As noted above at pp. 9-11, plaintiff testified at the hearing that she had been seeing Ms. Amonett "three, four times" a month, or an average of once a week. As noted above at p. 11, plaintiff revised the frequency of her visits to Center Stone downward to "two to three times a month." In her supporting memorandum, plaintiff refers only to three visits in July 2009, two visits in August 2009, two visits in September 2009, one visit in January 2010, one visit in July 2010, and two visits in October 2010. (Doc. 12, p. 10, n. 2)

⁶ A page-by-page review of the medical records before the court supports the ALJ's determination that plaintiff never indicated physical limitations of the magnitude that she claimed at the hearing.

*resigned* from her job cooking at the school because of her knee problems, but later in the interview, said she had been *fired* from a job for missing days due to cocaine abuse. [Doc. 10, pp. 231-32][7] She told Mr. Doran that her symptoms of anxiety *began when she had knee replacement* surgery *in 2009.* However, she testified that her depression and anxiety became a problem *when he son died in 2002.* [Doc. 10, pp. 173, 542] She testified to receiving treatment at Centerstone for the past two years, but the record shows treatment starting in July of 2009.[8] [Doc. 10, pp. 401-02, 541-42, 547] She told the psychological interviewer that she had never before received mental health treatment, but then changed her report to include treatment at Horizon, at the time of her son's death. [Doc. 10, pp. 172-73] Claimant told Mr. Doran that she heard *voices telling her to do things* such as prostitute herself. She testified at her hearing that she heard voices, but that they never *told her to do things.* [Doc. 10, pp. 174, 544] The inconsistent details do not, in and of themselves, disqualify claimant for disability benefits, but they do challenge the accuracy of her self-representation and confirm the suspicions of the previously referenced evaluator who described claimant as a poor historian, evasive, vague and defensive . . . . [Doc. 10, pp. 172-74]

(Doc. 10, p. 20)

As shown above, the ALJ's credibility determination complied with SSR 96-7p, and that determination is fully supported by the record. Accordingly, this claim is without merit.

## IV. RECOMMENDATION

For the reasons explained above, the undersigned **RECOMMENDS** that the plaintiff's motion for judgment on the record (DE 12) be **DENIED**, and the Commissioner's decision **AFFIRMED**.

The parties have fourteen (14) days of being served with a copy of this R&R to serve and file written objections to the findings and recommendation proposed herein. A party shall respond to

---

[7] Plaintiff told Mr. Dorland, and also testified at the hearing, that she quit her job as a cook because of her knees. (Doc. 10, pp. 173, 542)

[8] The record shows that the actual time between plaintiff's first visit to Centerstone on July 6, 2009 and the hearing on December 14, 2010 was less than eighteen months.

21

the objecting party's objections to this R&R within fourteen (14) days after being served with a copy thereof. Failure to file specific objections within fourteen (14) days of receipt of this R&R may constitute a waiver of further appeal. *Thomas v. Arn*, 474 U.S. 140, *reh'g denied*, 474 U.S. 111 (1986); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004).

  **ENTERED** this 15th day of January, 2014.


       /s/Joe B. Brown   
       Joe B. Brown
       United States Magistrate Judge

22